Preston, J.,
dissent'mg. On the 1st of August, 1837, Stephen Henderson made an olographic will, which, on the 14th of March, 1838, was duly proved, and ordered to be registered and executed by the Court of Probates of the parish .and city of New Orleans. By the will and a codicil, he appointed Jonathan Montgomery and Peter A. Rost his testamentary executors, and gave them the seizin of his estate. He left a very large estate, consisting, beside city property, of plantations and slaves.
The following important clauses in his will give rise to the controversies in this suit: “Article 6fh. All the children that is born five years after my death, if females, are to be free at the age of twenty years; and male children at the age of twenty-five ; at the end of the five years aforesaid, there may be drawn by lot, out of all the slaves, ten, five females and five males, who will be furnished with a free passage to our settlement in Africa, and one hundred dollars each, but they must go of their own free will, and to return to slavery if ever they return to this country; at the end of ten years, twenty may be emancipated in the same manner as the first five, and in twenty-five years all the first born free may be sent off with'the entire remainder of old stock that is willing to go, so as that at the end of twenty-five years after my death, there will not be upon any of my estates, any other slaves but the apprentice children ; and if the other slaves did not wish to go to Africa, they will remain upon their respective plantations upon which they reside, as apprentices, and to be provided for accordingly, but to be strictly under the management of the overseer, as well as all their offspring. The whole to be considered as apprentices, and their labor to be applied to the general good of all the affairs of my succession.”
“ Art. 7. It must be clearly understood, that the benefit now granted to my slaves, is not to extend to a murderer or thief, or a confirmed runaway, or for any other high crime that can be legally proved before the executors or the commissioners, which they have been guilty of; but at the same time I wish the negroes to have a fail, just, and impartial trial, the same in point of fact, as if they were tried before a judicial tribunal.”
“ Art. 8th. Some arrangement must be made with Plenry JDoyal, who is one-half owner of the Mount Houmas plantation and slaves, by selling the land to him, at the end of the first five years ; he in the mean time must liquidate his account at his leisure; paying no more interest upon any balance that may be due to my estate than six per cent per-annum; the negroes upon the Houmas estate to be emancipated upon the same conditions as those upon the other plantations, one-half of them being already my property. Mr. JDoyal would, no doubt, make an agreement with the executors for those belonging to him; every thing must, however, be settled with Mr. JDoyal, within ten years after my death ; he has been a faithful agent and partner in the management of these estates ; I therefore recommend him to the indulgence and notice of the executors.”
“ Art. 9th. The Destrehan estate is to remain forever as a part of my succession, and at the end of twenty-five years from my death it must be laid out into a city, to be named Destrehan.”
By subsequent clauses of the will, he declares that Destrehan city must be incorporated by an act of the Legislatui’e ; changes its name to Dunblane ; directs that four acres, including the back and front garden, running between parallel lines to the lakes, with all the dwellings, to remain as one lot, with a good street; *470 and buildings upon each side of the street; that a church shall be erected upon the upper corner of the lot; that a Presbyterian minister shall be sent for from the town of Dunblane or its neighborhood, and employed at a moderate salary ; that a good house shall be erected for the minister on the lower corner of the lot, and that there must be a small house for the education of the poor, over which the minister must preside.
He further directs, that after twenty years, if funds could be spared, a large manufactory of negro shoes and coarse clothing should be erected at the place, under the direction of experienced workmen from Scotland. “If these manufactorie.s (he says,) are well conducted, it will be the means of doing much good to the country, and give employment to a great many of the poor, and it will no doubt be the means of stimulating a great many of the young men to exert themselves, because by perseverance and industry they will see what can be done.”
For the purpose of accomplishing the objects proposed in these clauses of the will, and of making other legacies, he disposes of the whole of his estate, declai'ing that he had no forced heirs. By an agreement of the counsel of the parties, they limit the court to the determination of their controversies, growing out of the 6, 7, 8, 9, 10, 13,15, and 17th articles of his will. We have also been requested to postpone the decision of the question as to the emancipation of the testator’s slaves.
The hebra of Stephen Henderson and their representatives have instituted this suit against the executors, and allege that the foregoing clauses of the will are void; that to give effect to them in accordance with the intention of the testator and the tenor of the will would be impossible ; that they are parts and parcels of a complex indivisible disposition, which is contrary to law, and are, by the testator, made dependent on it, and cannot be sustained apart from the disposition of which they form subsidiary ingredients; and that they are otherwise in contravention of the laws of this State, and void for impossibility. The reading of the whole will exhibits the testator as a man of strong mind, of great practical good sense, without the advantages of much education or knowledge of our laws in relation to testamentaiy dispositions, and therefore he enjoined, that “ no exception be taken to his will on account of form, wilting or spelling.” “His greatest object,” as he expressed himself, “was to do the greatest quantity of good, and to the greatest number of persons, and to the poorest people.” But, with many of those who without families acquire great wealth in this country, he neglected to commence, and during life to place upon a sure foundation their benevolent intentions, and which become abortive at their death, by ineffectual testamentary dispositions.
The will is not written with precision, but the intentions of the testator are manifest. It is clear to my mind, that he had three leading objects in view, in making his will. 1. To emancipate all his slaves, and those in which he had an interest, and to send them to Africa. 2. To found a city to be called Dunblane, with a manufacturing establishment, a church, and school for the poor. 3. To establish a number of annuities, in favor of charitable and other institutions, some perpetual, and others for terms. In a codicil, he confirmed the provisions of the will in all its clauses, and declared his wish and desire, that any property of which he died possesséd, not passing for any cause whatever under any of the dispositions of his will, might accrue to his legatees, in proportion to the amount of their respective legacies.
*471 It is urged, that the testator has attempted to perpetuate his property in his succession, and, in violation of law, to make that inalienable which the policy of all civilized nations has declared shall, under various modifications, be marketable. Thus, he declared, that the Destrehan plantation, which was to be the site of the town of Dunblane, should forever remain a part of his succession. But this provision is to be construed-with reference to its establishment as a city, and incorporation by the Legislature, which he subsequently directs. The obvious meaning of the whole is, that it is dedicated to public use forever, under such regulations as the Legislature should, by an act of incorporation, prescribe. The establishment of a city necessarily implies the division of the site into squares and streets, and the sale of the squares, by authority of law, would be in pursuance of, and not in violation of, the dedication of the whole to the public. The sovereign power might even dispose of the avenue reserved if the interest of the city required it; because the testator, by directing its incorporation for the benefit of those who might inhabit it, giving them no rights or property but what might be derived from the act of incorporation, evidently subjected the whole to the wisdom of the Legislature. He directs that every thing belonging to his estate is to be continued and conducted as it may be found at his death. This is evidently a temporary provision, subject to the three great objects of the will. So, with regard to his city property and plantations, there is no prohibition of their sale. There are directions to make leases of his city property, which may extend to twenty-five years, but not perpetually. It has never been questioned, that perpetual annuities may be created, in favor of institutions or classes of society capable of enjoying them. The property or fund belongs to- the institutions or classes of society to which it is donated, and may be kept and used by them and their successors, so long as no law is violated in the last case, or as long as the act incorporating the institution in the first case, authorizes it.
To accomplish the great objects of the will, to wit, the transportation of his slaves and those in which he had an interest, to Africa, the establishment of the perpetual annuities, and the city of Dunblane, and, indeed, for. other objects, the executors, testamentary or dative, might at all times apply to the courts for orders of sale, which would be decreed for those purposes: the private sales, except that to Mr. Doyal, being unauthorized by the will and of course by law. It is proper here to remark, that if commissioners could not be appointed as directed, to execute the .will, in case of the death or resignation of the testamentary executors, it is always competent for the court in which the succession was opened to appoint dative executors.
With regard to the establishment of the city of Dunblane, I have come to the same conclusion with the district judge; but he has placed his judgment upon grounds to which I cannot assent, and deem it my duty to state the reasons of my opinion. The judge declares, “ that property passed on the decease of its owner, 1st. To his heirs appointed by law. 2d. To those he devises it to. Some person, natural or artificial, must be in existence to fill one of the places, or the land escheats. The ownership cannot remain in abeyance. The inheritance is cast upon the heir-at-law, or instituted at once.” And article 1702 of the Civil Code, is quoted in support of the opinion.
This opinion of the district court conflicts directly with the decision of the Supreme Court of the State, in the case between the Executors and Heirs of the late Alexander Milne, 17 L. R. 52. The testator devised half his estate in favor of two charitable asylums, not in existence at the time of his death, but to be incorporated after his death, with power to receive his legacies irs *472 their favor. The general assembly of the State, at its first session after his death, incorporated the asylums ; and the courts of this State, after able and elaborate arguments on behalf of the heirs, maintained the dispositions of the will.
So in the case of Inglis v. The Trustees of the Sailor’s Snug Harbor in the city of New York, the testator had devised a large estate to establish that institution, and requested in his will, that it should be incorporated by the State of New York. The Legislature did incorporate it five years after the testator’s death, and the Supreme Court of the United States, after great investigation and deliberation, declared the devises valid. 3 Peter’s Rep. 112. And for half a century the institution has remained a noble monument of the wisdom of the testator who devised it, the Legislature that established it by law, and the jurisprudence that maintained the devise.
Judge Story delivered an elaborate dissenting opinion in the case of The Sailor’s Snug Harbor, and referred to a decision he had prepared in the case of The Philadelphia Baptist Association v. Smith and Robertson, in which he came to the conclusion, that a bequest to the association was void, because “the legatees were not at the time a corporate society capable of taking it; and it is a maxim, that the legacy must take effect at the death of the testator, or be void at that time, and the right vest in another.” But in this opinion he admitted “that the government of a State os parens patriae has a right to enforce all charities of a public nature by virtue of its general superintending authority over the public interests, where no other person is entrusted with it.” If so, the proposition that the title to property cannot remain in abeyance a resonable time to enable the government to provide the proper means to enforce the bequest, is a refinement to which we cannot assent. The English chancellors have often enforced executory devises, without a freehold to support them ; and have said, that the only question was whether the contingencies were to happen in a reasonable time or not. Thelluson v. Woodford, 4 Vesey, Jr., 325. And it has been decided inEnglaud, “that if a corporation, for whose use a charity is designed, is not in esse, and cannot come into existence but by some future act of the crown, as for instance a gift to found a new college which requires an incorporation, the gift is valid, and the court will execute it. White v. White, 1 Brobis Chan. Cases, 12. Attorney General v. Downing, Ambler 550, 571. Attorney General v. Bowyer, 3 Vesey, Jr., 714, 727. There is no reason that the same principle should not apply in this country to a legacy for any purpose of public utility.
In our State there should not be a question on the subject. The testator vests the seizin in the executor, and divests the legal heir. The seizin is vested in the executor for a purpose which, if lawful and possible, he may accomplish. The heir has neither seizin of, nor interest in, the property bequeathed for the object, unless the legacy lapse. The article 1702 of the code is not inconsistent with, and is to be construed subject to, these plain principles; otherwise the executor could not lay a marble slab over the body of his testator without the consent of an heir whom by will he had divested of all title to his property.
So also substitutions and fidei commissa are prohibited by our code; but the prohibition is subject to the rights, powers and duties, expressly given and prescribed to executors, by the same code, which are all summed up in article 1665 : “The testamentary executor is bound to see the testament faithfully executed.” We concur in opinion with the Supreme Court of this State in the case of Mathurin v. Livaudais, that the framers of our code, in abolishing substitutions and fidei commissa, “never contemplated to abolish naked trusts, uncoupled with an interest, which were to be executed immediately.”
*473 Executors are sworn officer's of law, peculiarly under the control of the courts; and there is no danger of their exercising unlawful trusts, Or of the creation in their hands of perpetuities inconsistent with public policy.
I am, therefore, of opinion, that the dispositions of the will in favor of the City of Dunblane and its establishments did not lapse' immediately on the decease of the testator, for the want of a legatee in which they should vest at the tirite, gs held by the district judge.
Had the General Assembly of the State of Louisiana, within a reasonable time',incorporated the inhabitants of the city of Dunblane, with power to carry into' effect the objects of the testator, the dispositions of the will might have beeti accomplished.
But the Legislature have not incorporated the city of Dunblane, though twelve years have elapsed since the death of Stephen Henderson. It does not appear, that any of the successive representatives of the parish, nor the'parochial authorities, nor any 'citizen of the parish where the City Was to have been established, has applied for the incorporation. This indicates that the Legislature, the parochial authorities and citizens do not consider expedient the incorporation of such a city, principally for manufacturing purposes, by white laborers, in a parish peculiarly agricultural. Not only" a reasonable, but very ample time has elapsed for the public authorities to provide for the enforcement of the dispositions'of the will in this respect, Without the first step being taken for that purpose.
I amt of opinion, therefore, that the dispositions of the will providing for the incorporation, of the city of Dunblane, and to make charitable and other establishments in it, have lapsed for non-acceptance by proper authority in a reasonable time, and that the property should vest irrevocably in the heirs Or their vendees.
The 8th clause' in the will in favor of the slaves owned jointly between the testator and Henry Hoyal is attacked, because the testator could not remove or emancipate slaves in which Hoyal had an interest. That is true; but the executors had a right to demand a partition, and to remove to Africa those which fell to the share of Henderson's estate. It was uncertain, as contended, which of the slave's should receive the beneficence of Henderson; but the chance of receiving it was a right which vested in each slave at his death, and which slaves should enjoy it depended upon a legal partition between Hoyal and Henderson’s executors.- Instead of a partition, however, the testator directed that some arrangement should be made with Mr. Hoyal; declared he had no doubt Mr. Hoyal would make an agreement with his executors for his half of the negroes; directed the sale to him of the testator’s half of the land; recommended him highly to their kindness and indulgence, being already a debtor of the estate. Under this clause of the will Hoyal, in act of compromise with the heirs of Henderson, dated the 1st of June, 1839, reciting its provisions, and protesting against the right of Henderson to emancipate the slaves in Which he had an interest, yet in the words of the act “claimed the right of purchasing the undivided half of the Mount Houmas plantation and slaves belonging to the estate of the late Stephen Henderson, at a reasonable price to be fixed by experts appointed to that effect, in case the parties should not agree upon the same,” and purchased the undivided half of the plantation and slaves from them.
The parties referred to the following clause in an act of compromise and division among the heirs and executors of Henderson, made on the 11th of April, 1839, “that in case the Court of Probates for the parish and city of New Orleans, or the court having jurisdiction in the matter shall decide, that the undivided half of the slaves belonging to the succession of the late Stephen *474 Henderson are to be sent to Africa, in obedience to the last will of said Stephen Henderson, and are entitled to receive each one hundred dollars, and in the event that the said Henry Doyal should in such case agree to receive a sum of money to consent that his own half of said slaves shall also be sent to Africa, on the same conditions; then the said Henry Doyal shall bind himself to comply with such part of the judgment of said court on the subject; and that in such case a deduction of twenty per centum on the appraised value of the slaves, as the same are appraised in the inventory, shall be made from the first installment of the purchase price of said plantation and slaves,”
Under this claim and reference the parties made the following agreement: “It is further agreed and understood by and between the said parties hereto, that the present sale is made and accepted under the condition, that in case the Court of Probates for the parish and city of New Orleans, or any court having competent jurisdiction in the matter, shall decide that the undivided half of the slaves attached to the said plantation, and belonging to the estate of said late Stephen Henderson, are to be sent to Africa, in obedience to the last will of the said late Stephen Henderson, and are entitled to receive each one hundred dollars, the said Henry Doyal shall, as he does hereby bind himself to comply with- such part of the judgment of said court on the subject, and that in such case a deduction of twenty per centum on the appraised value of the said slaves, as the same are appraised in the inventory of the said plantation and slaves made by the Hon. Edward Duffel, Parish Judge in and for the parish of Ascension, on the sixth day of April, 1838, shall be made from the first installment of the purchase price of the said plantation and slaves, or from any other installment of the said purchase price, as the said parties may agree upon.”
The executors clearly understood by all these acts, that they conveyed Henderson's undivided half of the plantation and slaves to Doyal, upon the condition that he should submit his undivided half of the slaves to the 8th clause of Henderson's will, because they had no power to sell to him in any other manner, and were bound by the will and their duty to sell to him on that condition alone.
The heirs and executors jointly so understood the sale to be made to Doyal, because they authorized the sale to him on the following condition: “that in case the court having jurisdiction of the matter shall decide, that the undivided half of the slaves belonging to the succession of the late Stephen Henderson are to be sent to Africa in obedience to the last will of the late Stephen Henderson, and are entitled to receive each one hundred dollars, and in the event that the said I-Ienry Doyal should in such case agree to receive a sum of money to consent that his own half of said slaves shall also be sent- to Africa apon the same conditions, then the said Henry Doyal shall bind himself to comply with such part of the judgment of said court on the subject; and that in such case a deduction of twenty per centum on the appraised value of the slaves, (that is, the whole of the slaves,) as the same are appraised in the inventory, shall be made from the first installment of the purchase price of said plantation and slaves.” And because they expressly forbid a private sale to Doyal, unless he consented to the condition, by providing “that in the event the said Henry Doyal shall refuse to purchase the undivided half of the plantation and slaves, on the conditions herein specified, an action of partition shall be instituted against the said Henry Doyal, and the Mount Houmas plantation will be sold at public auction, in order to effect said partition.
Doyal understood that he was purchasing upon the condition that his interest in the slaves should be subjected to the conditions of the 8th clause of Hender *475 son's will, because he claimed the right to purchase at private sale Henderson's undivided half of the slaves, by virtue of that clause in his will, and thereby made that clause and all its conditions a part of his contract, as muchas if it had been incorporated in the bill of sale made to him. He accepted the conditions of the clause to avoid an action of partition and a public sale at auction, in which the executors of Henderson would have had greatly the advantage of him, as the estate was immense, and he, as appears by the will, was already indebted to it.
He, moreover, subjected his half of the slaves to the conditions of the 8th clause in Henderson's will, because he says in the bill of sale to him, “that he has particularly taken cognizance of the powers granted by the parties to the deed of transaction unto P. A. Rost and J. Montgomery. In that deed the power to sell at private sale to him was given only on condition, that he should accord to his undivided half of the slaves the same beneficence Henderson had bequeathed to his undivided half of the slaves. This power, therefore, was also made a part of the bill of sale to him, as much as if it had been incorporated in words in the bill of sale.
The consideration of subjecting his interest in the slaves to the same condition as Henderson's interest, appears in the very words of the sale made to him. In case of the decision of the court against him, there is to be a deduction of twenty per centum on the appraised value of the whole, and not of Henderson's undivided half of the slaves', as the-same are appraised in the inventory of the plantation and slaves made by the parish judge. The inventory is not before us, but as it is thus made a part of the bill of sale, it is reasonable to conclude, that he purchased the undivided half of the slaves at the appraised value in the inventory, and was willing to sell his undivided half at the same appraisement, with the deduction of twenty per cent, in case the decision of the court should be against him. Even if this equitable conclusion as to the consideration for which Doyal was obliged to subject his undivided half of the slaves to the conditions of Henderson's will is inadmissible, still a court, if he was so obliged, would compel him to comply for a reasonable compensation.
At all events, he reserved nothing but the right of contesting Henderson?s power to direct the emancipation of slaves in which he had an interest, fhat right is fully reserved to him by our decision, and is to be the subje.e.t matter of future discussion.
It is said, the executors might compel Royal to ascertain by lot which of the slaves should be entitled to Henderson’s benificence, -and which should not. Such a proceeding would not be binding upon the slaves, should the court determine that any part of them were entitled to their freedom. Neither Royal nor the executors contemplated any such proceeding, and the executors did not intend to be subjected to it. The intentions of the exeeutors in the power they gave to sell are not obscure; but if so, their intentions are to be construed with constant reference to the 8th clause in Henderson’s will, -which they wexe bound to cany into effect. And Royal's obligations as pux-chasex, if left in doubt by the words of the sale, are to be construed by the 8th clause in the will, and by the clause in the transaction between the heirs, executors and legatees, in which they gave the power to sell to him, and to bo.th of which he expressly referred in his purchase.
It is said, that the executors .of Henderson would have a right, in case the court should decide that his slaves held with Royal were entitled to be sent to Africa, to sue Royal for a partition, and thus extend the beneficence of their -testator to the slaves that might fall to them. Neither the executors, nor Henderson's *476 estate have any longer a title to the undivided half of the slaves; and, therefore, cannot sue for a partition. Besides, the heirs and executors, to exonerate themselves from the necessity of sqch an action,, provided in the contract by which they gave power to sell to Boyal, ¿‘that in the event the said Henry Boyal shall refuse to purchase the undivided half of said plantation and slaves, on the conditions herein specified, ¡(that is, that his own half of the slaves shall be sent to Africa,) an action of partition shall be instituted against him, and the Mount Houmas plantation sold at public auction, in order to effect a partition.”
They thus waived the action of partition of the slaves, and a sale at auction of the plantation, op condition that Boyal agreed to the arrangement contemplated in the 8th clause of Henders.on’s will, because they could waive neither, nor give powers to sell at private sale to hini on any other condition.
If, therefore, this court should determine, that Idenqlerson’s slaves should be emancipated and sent to Africa, in my opinion Henry Boyal has obliged himself to permit all the slaves on the Mount Houmas plantation, at the death of Stephen Henderson, and their issue, to be sent to Africa, upon the same conditions prescribed by the testator for those upon the other plantations ; and that .the judgment of the district qoprt on the questions submitted to us should be .affirmed.